L. A. ANDREW, Superintendent of Banking, Appellee, v. CITIZENS STATE BANK of Mt. Vernon, Defendant; ROWENA ELOISE STUCKSLAGER, Executrix, Defendant, Appellant.

No. 42457.

JUNE 21, 1935.

REHEARING DENIED SEPTEMBER 17, 1935.

Elmer A. Johnson and R. B. McConlogue, for appellant.

Donnelly, Lynch, Anderson & Lynch, and Carl Becker, for appellee.

HAMILTON, J.—The Citizens State Bank of Mt. Vernon, Iowa, was organized by Olin J. Sweet in 1901, with a capital stock of $25,000. It continued as a going concern until September 22, 1931, at which time the court adjudged said bank to be insolvent and appointed L. A. Andrew, Superintendent of Banking of the State of Iowa, receiver. Thereafter, under proper order of court, suit was brought by the receiver against the stockholders to collect a 100 per cent assessment on the shares of the capital stock of said bank. The stock records of the bank disclosed that C. Falcon, who was president of the bank at the time it closed, was the record owner of 120 shares of stock, and in the original assessment suit the petition set up this fact and asked for a judgment against Falcon on his 120 shares of stock in said bank.

Before the trial of the case, upon further investigation, the receiver, through the examiner in charge, concluded that Falcon was not the actual owner of 118 of said 120 shares of stock, but that one W. C. Stuckslager, in his lifetime, was in truth and in fact the owner of 118 shares of said stock, standing on the records of the bank in the name of C. Falcon. Accordingly, an amendment to the petition was filed, bringing in Rowena Eloise Stuckslager, executrix and trustee of the estate of Willard C. Stuckslager, deceased, as a defendant, and asking for judgment against said executrix on said 118 shares of stock in the sum of $11,800.

The attorney for the executrix of said estate was notified of the filing of said amendment, and he agreed with the attorney for plaintiff to waive notice and enter his appearance and answer said amendment.

On the issues joined by the petition and amendments there-to, and the answer of said executrix, on the 12th day of June, 1933, at the regular May term of the district court of Linn county, Iowa, said cause came on for trial before Hon. H. C. Ring, one of the judges of said court, sitting as a court of equity. The court found for the plaintiff and against the defendant executrix and entered decree and judgment for $11,800 in favor of the plaintiff, from which finding of the court the defendant executrix has appealed.

Under the issues joined and the concessions of the parties to the suit made of record, the only question before this court for determination is the question of ownership of the 118 shares of stock, which, it is alleged, belonged to the said Stuckslager at the time of his death. Mr. Stuckslager's death occurred on or about the 23d day of February, A. D. 1931.

It is the theory of the plaintiff that shortly after the Citizens State Bank of Mt. Vernon—which, for brevity, will be hereinafter referred to as the Citizens bank—was organized, W. C. Stuckslager, who at that time owned a private bank in Mt. Vernon, known as the Mt. Vernon Bank, and also another private banking institution at Lisbon, Iowa, desiring to control the banking business of that community, and for some reason not wishing this fact to be publicly known, entered into an arrangement with one A. J. Berryman to take over a controlling interest in the stock of the Citizens Bank and to hold the stock in the name of Berryman, and to keep this matter of Stuckslager's connection with the bank secret. The principal witness for the plaintiff was C. Falcon, who for many years, either as cashier or president, managed the Citizens Bank. Falcon took charge of the bank after Berryman's death and continued as its manager until the bank closed, with the exception of about two years when one F. W. Howson was cashier. Howson is also deceased, and Falcon is the only person living, except possibly Mrs. Stuckslager, who has actual personal knowledge of the alleged secret connection of Stuckslager with said Citizens Bank.

This case presents purely a fact question. The only issue the court had to determine was the ownership of the 118 shares

of stock, to the end that the assessments might properly be made upon the stock against the actual owner thereof at the time the bank closed in September, 1931. On that date, C. Falcon was in charge of the bank as its president and active manager.

· ▮▮▮ The burden of proof was upon the plaintiff. The stock stood in the name of Falcon on the books of the bank, which raises a strong presumption that Falcon was the owner of said stock, but this is not conclusive. Our statute, section 9251 of the Code, imposes the liability upon "all stockholders", and is not limited to stockholders whose names are recorded on the books of the corporation. Bates v. Peru Savings Bank, 218 Iowa 1320, 256 N. W. 286. See, as supporting our own authorities, Ohio Valley Nat. Bank v. Hulitt, 204 U. S. 162, 27 S. Ct. 179, 51 L. Ed. 423; Wright v. Keene, 82 Mont. 603, 268 P. 545, 547, 60 A. L. R. 109. Quoting from the latter case:

"'The object of the statute is to get at the real owner of the shares, and the courts in construing it, uncover all his disguises, so that, if his name has never been on the transfer book, and his stock stands in the name of another by his procurement, he will yet be chargeable as a stockholder with the statutory liabilities.' * * * 'As to such owner, the law looks through subterfuges and apparent ownerships, and fastens the liability upon the shareholder to whom the shares really belong.'"

This is a rule laid down by the United States Supreme Court, which is applicable to national banks, and it is the rule which has been adhered to in our state under our prior decisions. It must be kept in mind at all times in considering the principles of law as applied to actions of this kind that the receiver represents the creditors and is endeavoring to recover for them collectively, and the essential matters for the court to determine are, (1) the necessity for the assessment and the amount thereof, and (2) to ascertain the stockholders and fix the assessment upon each individual shareholder for his proportionate amount of the assessment.

▮▮▮ The certificates of stock were issued to Falcon and were in Falcon's possession when the bank closed. He had consistently held himself out to the public and to the officers and directors of the bank as being the owner of said stock, and the bank records disclosed that he regularly voted this stock at the stockholders' meeting every year, including the one held in

July, 1931, six months after Stuckslager's death. He personally made out the reports to the assessor, which required the listing of the names of the owners of the stock, and in these reports he listed the stock in question in his name as the owner. These reports were signed and sworn to by him and covered the years 1927 to 1931, inclusive, and for each of these years the tax assessment record showed that Falcon was the owner of 120 shares of stock of the Citizens State Bank of Mt. Vernon. On the 18th day of February, 1929, Falcon executed an option contract to W. C. Stuckslager, giving Stuckslager the option to purchase 118 shares of stock of the Citizens State Bank of Mt. Vernon, Iowa, for the sum of $100 cash; the option to stand until September 1, 1930. This option was never exercised. At this time the bank was in difficulty, financial distress, and the stockholders were required to take up certain notes carried as assets of the bank and to put in cash to strengthen the bank's financial condition. W. C. Stuckslager furnished the money to Falcon to pay his proportionate share of this advancement of cash to the bank, and on February 18, 1929, Falcon signed a receipt which recites that he received of W. C. Stuckslager the sum of $9,500 in payment of an interest of this amount in certain notes amounting to $13,864.40 purchased by Clem Falcon and others from the Citizens State Bank of Mt. Vernon, Iowa, on said date. And again in February, 1931, the banking department required additional advancements of cash, and at that time Stuckslager furnished the money to Falcon in the amount of $6,400. Two notes were executed for $3,200 each, payable upon demand to the order of W. C. Stuckslager, and were signed by Clem Falcon and bore date of February 9, 1931.

These documents on their faces indicate Falcon as the owner of a large portion of the stock of said bank. Falcon continued to operate the bank after Mr. Stuckslager's death and did not indicate by word, act, or conduct that the death of Mr. Stuckslager would in any way affect his relationship to said bank. It is undisputed that Falcon attempted to dispose of some of the stock after the death of Mr. Stuckslager for the purpose of raising money to pay the two $3,200 notes which were held by a bank owned by Stuckslager at the time of his death. Mr. Van Metre, connected with the Stuckslager bank, called upon Falcon shortly after the death of Mr. Stuckslager in regard to the payment of these notes. At that time, Falcon said, he was trying to dispose

of his bank stock and as soon as he could sell his bank stock he would pay the Stuckslager estate the notes. He called on Falcon the second time and received the same answer. At this second interview Falcon said something about organizing a new bank. It should be borne in mind that at this time there were no other banking interests in that vicinity except the two banks owned by Stuckslager and the Citizens State Bank, of which Falcon was president, and of which he now contends Stuckslager owned and controlled the majority of stock.

A little later on, the matter of merging the Citizens Bank with the Stuckslager banking interest was taken up with Falcon and the directors of the Falcon bank. During all these negotiations it was never revealed to any one that Falcon was not the owner of the 120 shares of stock standing on the books of the bank in his name. A tentative agreement was drawn up to be submitted to the directors of the Falcon bank. This was rejected. Falcon then told the officers of the Stuckslager banking institution that his bank was not going to open up the next morning unless he could get some funds, and invited the representatives of the Stuckslager institution to reconsider and to make a different proposition of some kind in an attempt to effect a merger. Falcon was thus indicating that he was about to close the Citizens Bank without revealing to the administrator of the Stuckslager estate or the officers in charge of the Stuckslager banking institution that Stuckslager was vitally interested in said bank to the extent of 118 shares of its stock. During the negotiations Falcon stated to Mr. Charles Kuning, cashier of the Cedar Rapids National Bank, whom Mr. Falcon was endeavoring to interest in the proposed new institution, that he (Falcon) owned the controlling interest in the Citizens Bank. This talk was about six months after Mr. Stuckslager's death.

A Mr. Macfarland, a son-in-law of Mr. Stuckslager, who is vice president of the Northern Trust Company of Chicago, and who was interested in the Stuckslager estate and the banking interests owned by Mr. Stuckslager at the time of his death, was in Mt. Vernon aiding and assisting the administrator of the Stuckslager estate for a period of about a month after Mr. Stuckslager's death. They discovered the option contract hereinbefore referred to among the Stuckslager files. He, together with Mr. Van Metre, went to the Citizens Bank to call upon Mr. Falcon with the view of determining the status of the Stuckslager es-

tate under this option contract, and of obtaining a possible renewal thereof, to the end that they might be in a more advantageous position in attempting to reorganize the banking institutions owned by Stuckslager and possibly eliminate the Citizens Bank as a competitor. At this time Falcon denied that the estate had any interest under the option. He also refused to consider a renewal of the option, and denied that the estate in any way had any interest in the stock. Macfarland testified that prior to the time this option contract was discovered he knew nothing of any right which Mr. Stuckslager had under said option contract, and that he was never advised by Mrs. Stuckslager that she knew of any claim on the part of Stuckslager to this stock. Falcon knew that these men represented the Stuckslager estate, yet he did not disclose to them that Stuckslager had any interest in the Citizens Bank, but on the contrary asserted that Stuckslager had no interest therein.

It appears from the record that the first intimation that any one connected with the Stuckslager estate had that there was any claim by any one that Stuckslager was interested in the Citizens Bank was after suit was begun by the legal representatives of the Stuckslager estate against Falcon upon the two $3,200 notes. Mr. E. A. Johnson, who was attorney for the Stuckslager estate and one of the attorneys for appellant herein, testified that shortly prior to October 20, 1931, the executors of the Stuckslager estate turned over to him for collection the two Falcon notes of $3,200 each, and that he called Mr. Falcon over the telephone, advising him in substance that he had these notes for collection and asked Falcon whether he was willing to confess judgment on the notes. Falcon did not agree to this proposal. Later on suit was commenced. Notice was served on Falcon, and Falcon then came to Johnson's office. Johnson relates the following conversation: ''Mr. Falcon said he came to see me about those notes and I said, all right, what do you want to do about it. Well, he said, I came here to tell you that I don't propose to pay those notes, and, he says, I claim that I was running that bank as Stuckslager's agent, and if—and the stock I had in my name, 118 shares of it, I claim is Stuckslager's stock, and I came here to tell you that if you dismiss this suit and cancel these notes that he would take care of the assessment on that stock, because, he says, there is an assessment levied or about to be levied on this stock, and if this suit is not dismissed

and these notes cancelled I will make the Stuckslager estate pay the assessment on that stock. I said to him your proposition is an astounding one to me. I said, do you mean to say you have kept that stock ever since Stuckslager died and you claim you were not the owner of it, and that you never undertook to turn it over to these executors or myself or anyone, for that estate, I said, do you make that claim? Well, he said, yes, but that didn't make any difference, I demand that this case be dismissed and these notes be cancelled or I will make the estate pay that assessment on that stock, and if they will do that I will take care of the assessment.'' Falcon makes no denial of this testimony.

In the face of all this evidence, both documentary and oral, Falcon now undertakes to change his position entirely,. and asks the court to accept his statement at this time and to refute the records of the bank and the documents sworn to by him as an officer of the bank and his open, avowed declarations of ownership to the public, to his fellow bank officials and directors, that he was the owner of this stock, which position he had maintained until suit was brought upon the notes above referred to. There is some little corroboration of his claim that Stuckslager had something to do with the organization of the Citizens Bank. There was a deposit slip of the Citizens Bank introduced in evidence, which showed a deposit made by Olin J. Sweet, the original organizer of the bank, and who, it is claimed by Falcon, sold out to Stuckslager, of a check drawn on the Mt. Vernon bank by a Mr. Berryman for $16,400. At that time Berryman had no account with the Mt. Vernon bank, which was the Stuckslager bank. The records of the bank following this transaction show dividends paid to the record holders of the stock, and the bank records show that there were cash withdrawals from time to time from 1904, when the bank was taken over by Mr. Berryman, to 1922, which cash withdrawals in many instances were in the exact amounts to correspond with the amount of stock that Falcon claims was owned by Stuckslager, and Falcon testified that these cash withdrawals belonged to Mr. Stuckslager and were handed to him in cash. It appears, however, that no one was ever present when any of this money was turned over to Mr. Stuckslager, and while the record shows that the books and papers of the Stuckslager bank—the Mt. Vernon Bank—which was under the personal management of Mr. Stuckslager, were produced in court, none of said records was introduced in evidence,

and it is fair to presume that they disclosed nothing which would connect Stuckslager with any of these dividend payments. There are but two of these dividend items that can in any way be directly traced to Stuckslager—a check written by Falcon for one of such items, and a draft issued by the City National Bank at Clinton for one other item, both of which documents were made payable to W. C. Stuckslager and indorsed by him. There is nothing other than the circumstances that the amounts of these items correspond to the amount of stock which Falcon claims was owned by Stuckslager at that time to connect them with the dividend payments. However, this corroboration ceases with the July, 1922, dividend. The bank continued to pay dividends until 1924, but there were no further cash withdrawals, and for a period of nine years from 1922 to the date the bank closed there is nothing to show that Stuckslager had any connection with this bank, other than the testimony of Falcon, except that it is also claimed that the fact that Stuckslager furnished the money to purchase the notes of the Citizens Bank at the time it was in distress indicated that he had a personal interest in the Citizens Bank. His conduct in this respect is consistent with the defendant's theory that he was interested in the banking business of that community and owned two private banks and was aiding his competitive institution to avoid bringing on a financial crisis in the closing of the Citizens Bank, which would vitally affect his banking institutions. That this was a very common practice in communities throughout the state is a matter of common knowledge.

It is contended by appellant that Falcon was not a competent witness because of his interest in the bank. It is shown, however, that the receiver settled with Falcon on his two shares of stock by taking his note, and dismissed the action as against Falcon, and that thereafter Falcon had no interest, either as a stockholder or as a debtor of said bank, and was not a party to the suit, and that thereby he was rendered competent to testify. The appellant contends that there was collusion between the examiner in charge of the bank and Falcon, and that the settlement was made for the purpose of rendering him competent as a witness. The testimony of the examiner to some extent bears out the appellant's contention in this regard, and the court is not in entire accord on this issue. However, it is not necessary for us to pass upon the question of Mr. Falcon's competency as a

witness. We may assume for the purpose of the discussion of this case that he was a competent witness. Does not his inconsistent conduct over a period of years, persisted in up to October, 1931, after this bank was closed and in the hands of a receiver, render his testimony subject to grave doubts and suspicion, and should the decision of a court of justice be permitted to rest upon a foundation so unstable, unless bolstered up and fortified in every material part by other credible evidence? It may be that Mr. Falcon is now telling the truth. The trial court had the advantage of the presence of the witness, and was therefore in a better position to judge of the credibility of the witness than is this appellate court, and for that reason this case has caused us considerable difficulty, and we hesitate to arrive at a different conclusion than that of the lower court when it comes to a question of the credibility of the witness.

But regardless of how the witness may have appeared upon the witness stand, regardless of how frank and open his testimony may have been at the trial, should this be permitted to overcome the admittedly inconsistent acts and conduct of the witness in the so recent past, and to overcome the undisputed documentary evidence of ownership of the stock, especially when considered in the light of the motive which prompted Mr. Falcon to come out from under cover and reveal what he now contends to be the true state of facts? After long and careful discussion and deliberation, the court has been unable to reach an agreement on the basis of permitting the decree of the court to rest on testimony of this character, furnished almost entirely by the person in whose name the stock appears upon the stock books of the bank and who is in this action attempting to avoid personal liability, and thereby impose liability upon the estate of one whose lips are now sealed in death. Such testimony as is disclosed by the record in this case is fraught with too many inherent weaknesses to warrant the court in giving it the weight and credibility necessary to uphold the decision of the trial court in this case.

It therefore follows that the judgment of the trial court must be, and it is hereby, reversed.—Reversed.

All Justices concur.